IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MICHAEL G. WEBB,

    Plaintiff,

vs.

WILLIAM A. HALTER,
Deputy Commissioner of Social Security[1],

    Defendant.

FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

FEB 21 2001

Civ. No. 00-617 MV/RLP

CLERK

## UNITED STATES MAGISTRATE JUDGE'S
## ANALYSIS AND RECOMMENDED DISPOSITION[2]

1.    Plaintiff, Michael G. Webb, (Plaintiff herein) filed applications for Disability Income Benefits (DIB) and Supplemental Security Income (SSI) under titles II and XVI of the Social Security Act on January 16, 1997, alleging that he had been disabled since August 3, 1995. He alleged that his disability was caused by a ruptured disc, nerve damage to his lower back and right leg/foot, epilepsy and dyslexia. His applications were denied at the first and second levels of administrative review and by an Administrative Law Judge (ALJ herein). The Appeals Council declined to review the ALJ's decision. The matter is now before the Court on Plaintiff's Motion to

---

[1]William A. Halter was sworn in as Deputy Commissioner of Social Security on January 19, 2001. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, William A. Halter should be substituted for Commissioner Kenneth S. Apfel as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of §205(g) of the Social Security Act, 42 U.S.C. §405(g).

[2]Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.



Reverse the Commissioner's decision and Remand for rehearing.

**I.      Standard of Review**

2.      This Court reviews the Commissioner's decision to determine whether the factual findings are supported by substantial evidence and whether correct legal standards were applied. **See Hawkins v. Chater**, 113 F.3d 1162, 1164 (10th Cir.1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales**, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quotation omitted). Although I may "neither reweigh the evidence nor substitute (my) judgment for that of the agency," **Casias v. Secretary of Health & Human Servs.**, 933 F.2d 799, 800 (10th Cir.1991), I have the duty to carefully consider the entire record and make my determination on the record as a whole. **Dollar v. Bowen**, 821 F.2d 530, 532 (10th Cir.1987).

3.      The Commissioner has established a five-step sequential evaluation process to determine if a claimant is disabled. **Reyes v. Bowen**, 845 F.2d 242, 243 (10th Cir.1988). If a claimant is determined to be disabled or not disabled at any step, the evaluation process ends there. **Sorenson v. Bowen**, 888 F.2d 706, 710 (10th Cir.1989). The burden of proof is on the claimant through step four; then it shifts to the Commissioner. Id.

**II.     Vocational and Medical Facts**

4.      Plaintiff was born on December 8, 1958 (Tr. 76), and has been a "younger individual" at all times material hereto. He was enrolled in special education, completing either the 9th or 10th grade. (Tr. 155, 159, 227). He has previously been employed as forklift operator and construction laborer. (Tr.106-115, 355).

### A. Seizure Disorder

5. Plaintiff developed a seizure disorder at age 19 or 20. This disorder was initially treated with medication. He stopped taking medication at age 22 because of side effects, and because the medication did not seem to alter the frequency of his seizures. (Tr. 361). In a medication history, he stated that he had been seizure free for two years as of November 1995. (Tr. 190-191). In a document dated February 16, 1997, he stated that he had a seizure two months earlier. (Tr. 137). However, in a medical history given in April 1997, he stated he had been seizure free for two years. (Tr. 231, 254). At the time of his administrative hearing on April 14, 1998, he testified that his seizures had restarted, and that he had eight seizures in the prior three-four months. (Tr. 360). There is no medical evidence documenting renewed seizure activity.

### B. Borderline Intellectual Functioning and Illiteracy

6. Plaintiff completed either the 9th or the 10th grade, taking special education classes. (Tr. 155, 159, 227). He testified that he cannot read, write legibly, or make change. (Tr. 353-354, 357, 359, 361). His mental functioning has been evaluated on several occasions, and his intellectual functioning has been tested once.

7. In February 1992, Raoul Berke, M.D., conducted a psychiatric evaluation during of an overnight hospitalization following a suicidal gesture. Dr. Berke described Plaintiff as "a rather slow talking, dull looking man. . . . His speech is rather slow as he hunts for words. I imagine this is how he usually is. He is not particularly intelligent or insightful." Dr. Berke prepared a psychiatric diagnosis that included probable borderline mental retardation. No formal intellectual testing was performed. (Tr. 159-160).

8. In November 1995, three months after his alleged date of onset of disability, Cheryl

3

Hollingsworth, M.D., conducted a psychiatric consultation after a second suicidal gesture. Dr. Hollingsworth described Plaintiff's mental status as follows:

> Speech is normal and fluent. Hallucinations - none. Delusional thoughts - none. Formal thought disorder - none. Paranoia - none. He thinks he hears a beeping sound about every 50 to 60 seconds on his phone and thinks that the phone might be wired. He said this was suggested by his attorney. Mood is euthymic, sometimes cheerful. Memory is intact. He does have poor recall for short term memory. Orientation times four. Judgment poor as evidenced by writing a note that said he might hurt himself. Insight – none. Intelligence - appears to be in the borderline intelligence range. Suicidal ideation - denies. Obsessive thoughts - denies. Compulsive behavior - denies.

Dr. Hollingsworth diagnosed borderline intellectual function, rule out mild mental retardation. No formal intellectual testing was performed. (Tr. 204-205).

9.   On April 3, 1997, Will D. Parsons, PhD, conducted a consultative psychological evaluation, which included administering the WAIS-R Intelligence Test. Dr. Parsons noted:

> Mr. Webb's rate and flow of speech was mildly slowed and he appeared to have some mild expressive problems especially in accessing common words. He appeared to be mildly dysthymic and expressed that he was feeling pain and discomfort periodically throughout the time that we spent together. . . . He also reports that he does not think about (suicide) any more and does not feel as depressed as he once did. He denied ever having experienced hallucinations or delusions but does admit to having a problem with alcohol albeit somewhat tangentially.
>
> Generally Mr. Webb's judgment and insight appear to be within normal limits. His intellectual abilities appear to be in the borderline below average range and this was confirmed by the WAIS-R.

(Tr. 229).

Plaintiff scored a borderline verbal IQ of 75, and low average performance IQ and full scale IQ of 86 and 80, respectively on the WAIS-R. (Id.) Dr. Parsons stated that these scores may have been depressed "somewhat" by the "fairly considerable subjective pain" Plaintiff was experiencing during the testing which impacted on his ability to attend and concentrate. (Tr. 230). Dr. Parsons also

4

noted that Plaintiff understood the concept of money and was probably competent to handle benefit payments. (Id.).

### C.     Back and Leg Impairments

10.    Plaintiff originally injured his back in March 1995. Records of his treating chiropractor indicate that he sustained a compression fracture at an unspecified level, and had low back pain with muscle spasm. (Tr. 292-295).

11.    Plaintiff was involved in a motor vehicle accident on August 3, 1995, when the motor cycle he was riding collided with a postal truck that had run a stop sign. (Tr. 188). This is his alleged date of onset of disability. He sustained multiple injuries, including a compression fracture of the L-2 vertebrae and severe hip contusions. (Tr. 164) While hospitalized, his pain was described as relatively severe and unremitting (Tr. 170, 173). He also had numbness and tingling of his right leg, and loss of knee jerk with quadriceps weakness.  (170-171, 174). He was treated with bed rest, physical therapy and "lots" of pain medication. (Tr. 164). He was discharged from the hospital on August 9, 1995, using a walker (Tr. 173), with a prescription for pain medication and instructions for physical therapy. (Tr. 164, 175).

12.    He was treated in the emergency room on two additional occasions in August 1995 for back pain. On August 20 he had exquisite pain from T10-S1 and spasm along his spinal muscles, decreased sensation of all dermatomes of his right leg and decreased quadriceps strength. He required treatment with injections of *Toradol* and *Norflex*. He was discharged home and advised to be at bed rest, to apply ice and heat to his back and to take *Naprosyn, Flexeril* and *Darvocet N-100*. (Tr. 219). He was also instructed to use a wheel chair and to follow up with Dr. Gutierrez. (Tr. 220). He returned to the emergency room on August 28 complaining of pain in his back, left hip,

5

and of burning in his leg. His physical examination as recorded was normal, except for muscle spasm in the right lumbar area. He was again given injections of *Toradol* and *Norflex*. His diagnosis on discharge was "sacroiliac inguinal ligament strain." (Tr. 213-214).

13. Plaintiff was seen for a third time in the emergency room on October 4, 1995, for complaints of back and chest pain. He was treated with *Norflex* and referred to Dr. Gutierrez and physical therapy. (Tr. 209-210).

14. On November 21, 1995, Dr. Gutierrez admitted Plaintiff to the hospital from the emergency room for evaluation and treatment of depression with suicidal ideation. At the time, Plaintiff was complaining of back, pelvic and leg pain. (Tr. 207-208). Of note, Dr. Gutierrez' admit and discharge notes indicate that Plaintiff had suffered a fractured pelvis at the time of the August 1995 motor cycle accident.[3] (Tr. 190, 207-208). Dr. Gutierrez also noted that Plaintiff was using a cane to walk. (Tr. 207). When evaluated by Dr. Hollingsworth during this admission (see ¶ 8, supra), Plaintiff was using a walker and dragging his right leg. (Tr. 204).

15. Plaintiff was referred to Dean Karnaze, M.D., a neurologist, in October 1995. (Tr. 195, 263). Dr. Karnaze noted Plaintiff's difficulty walking. He recommended that Plaintiff get an MRI of his lumbar spine to evaluate his hip and his symptoms of lumbar radiculopathy. (Tr. 195-196). Plaintiff was initially unable to comply because of financial constraints. (Tr. 194). As of December 20, 1995, Dr. Karnaze noted that Plaintiff's strength was limited due to pain, referring specifically to his iliopsoas and hip adductors. He again reordered the lumbar MRI. (Tr. 194). When obtained in

---

[3] It is not clear when this diagnosis was made, as imaging studies of the pelvis obtained at the time of the initial hospitalization were read a normal. (Tr. 274).

6

March 1996, the lumbar MRI disclosed mild bulging and/or stenosis at multiple levels[4], degenerative disc disease, compression deformity at L2 which at not changed since August 1995 and mild facet arthropathy. (Tr. 198-199).

16. There is no record of medical care for the remainder of 1995 or in 1996.[5] Plaintiffs filed his applications for benefits on January 16, 1997. His next evaluation of record was the consultative psychological evaluation conducted by Will Parsons, PhD., on April 3, 1997 (see ¶ 9, supra). In terms of pain complaints, Dr. Parsons noted:

> ... (W)hile I talked with Mr. Webb the pain seemed to get the best of him from time to time, especially if he sat in one position for long periods of time. It was necessary for him to get up and walk around on several occasions during the course of taking the WAIS-R and at some points and (sic) time it appeared as if the pain was actually distracting him to the point that he could not think or respond appropriately to inquiry or to complete the task set before him on the WAIS-R. This examiner did give him several breaks throughout the course of the testing so that he could better focus, attend and concentrate but it appeared to be very difficult for him due to his expressed feelings of pain.
>
> * * *
>
> I suspect that the relatively broad range of scores on the performance side of the WAIS-R was probably produced by virtue of the fact that he was in pain and unable to complete the more difficult items on some sub-test.
>
> As stated earlier, Mr. Webb as some problems with attention and concentration probably due to the fact that he'd distracted by the pain primarily in his leg and hip.

(Tr. 229-230).

---

[4] Multiple levels of subligamentous annulus bulging including T11-12, T12-L1, L1-L2, L2-L3 and L4-L5; mild protrusion of the disc at L2-3 and L5-S1 but no significant extruded or free fragments seen.

[5] In a disability report submitted with his application for benefits, Plaintiff stated that he had received weekly treatment from Dr. Jim Aho, a chiropractor. Subsequent documentation submitted by Plaintiff indicates that treatment was received from July 18, 1996 to August 6, 1997. Plaintiff stated that he had seen Dr. Aho for spinal manipulation, that Dr. Aho had recommended Plaintiff see a neurosurgeon, but that he was unable to do so because of lack of insurance. (Tr. 85-86, 147). Dr. Aho's records from 1996 are not contained in the administrative record.

17.     Alan Jakins, M.D., conducted a consultative examination on Plaintiff of April 7, 1997. (Tr. 231-238). He documented decreased range of motion in Plaintiffs right knee, right hip and lumbar spine, instability of the lumbar spine at 30 degrees flexion, an inability to squat or walk on heels and toes, lack of balance while stooping, an occasional antalgic gait, use of a cane, pain on bending, impaired speed and stability of walking, spasticity of the right lower extremity, and quadriceps atrophy. Based on these findings he assessed Plaintiff's residual function capacity as follows:

> (I)t is my opinion that Mr. Webb has a lifting/carrying impairment of fifteen pounds occasionally and 10 pounds frequently. His standing and walking are impaired due to his antalgic walk and forward flexion method of deambulation. This may be able to be corrected with work, strengthening or physiotherapy. I do not believe that his sitting would be affected to any great degree, especially if this could be interrupted. His ability to reach is not physically impaired. His feeling is clinically intact; it is not impaired. His speaking, I feel, is not grossly impaired. His ability to handle is not impaired. He can certainly hear well enough here in the office today. His ability to travel would be affected by his back and "sciatica."

(Tr. 233-234).

In a Medical Source Statement appended to his report, Dr. Jakins stated that Plaintiff could stand/walk for 4-6 hours in an 8-hour work day. In terms of Plaintiff's capacity for sitting, Dr. Jakins contradicted his narrative report somewhat, stating that Plaintiff could sit for eight hours in an eight-hour work day, making no mention of the need to interrupt his sitting. (Tr. 237-238).

18.     Plaintiff was evaluated by Edward Benzel, M.D., and James Felberg, M.D., at the University of New Mexico Hospital on June 7, 1997, upon referral from Dr. Karnaze. (Tr. 319-320). On physical examination, Dr. Benzel noted significant paraspinal muscle spasm and decreased reflexes of the right quad Achilles. He reviewed Plaintiff's MRI, and stated that the abnormalities found did not require surgery. He diagnosed Plaintiff's back problem as mechanical in nature, and recommended abdominal stretching exercises, *Flexeril* with *Motrin* for pain, muscle relaxants and

8

referral to the Pain Clinic for possible treatment with epidural steroids.

19.  Plaintiff returned to Dr. Benzel in October 1997 complaining of low back pain and spasm, shooting pains in his medial thigh, leg and the instep of his right foot. He also had complete numbness of his right foot and paresthesias of the right instep and large toe. He stated that his back pain was worse when he lay directly on his back or when he walked, that he had been unable to do previously prescribed exercises because of pain and limited motion, and that he had had some relief with *Flexeril*. Objective examination revealed:

> ... (T)hat the patient has an obvious low thoracic deformity with very severe spasm of the lower thoracic and complete lumbar spine with guarding and point tenderness. He has complete limitations of range of motion in all directions. He has strong motor testing in bursts of strength, except the toe extensors on the right are 4-/5. He has diminished light touch in the entire right foot, but diminished pinprick in the instep of the right foot. There are no temperature or color changes today. Reflexes are 2 at the knees, 1 at the right ankle and 2 at the left ankle, and the toes are equivocal.

(Tr. 317).

Dr. Benzel recommended additional radiologic testing, a decrease in smoking and possible smoking cessation "since there is a direct cause of relationship between tobacco abuse and back pain," a progressive and monitored exercise program, and continued use of *Flexeril*. (Tr. 317).

20.  Two weeks later, on November 13, 1997, Plaintiff started a monitored physical therapy program. (Tr. 306). At the initial session, Plaintiff reported to the therapist that the weakness in his right leg prevented him from walking more than 1 block, and that his pain was aggravated by sitting and eased with lying. (Tr. 306). Objective testing demonstrated restricted range of motion, weakness of the right extremity, and an absent Achilles reflex on the right. (Tr. 307). Plaintiff attended ten therapy sessions, complaining of soreness at each session. (Tr. 303-306). Therapy was discontinued on December 5, 1997, due to lack of progress in either pain control or range of motion.

9

(Tr. 310).

21. Plaintiff returned to the neurosurgery clinic at the University of New Mexico on January 8, 1998, and was seen by Dr. Moróne. (Tr. 299-300). He reported that increased pain prevented him from doing recommended exercises. He also reported that he had decreased his smoking to ½ pack per day. On physical examination, Plaintiff had normal tone on his lower extremities, no frank weakness, negative straight leg raising test, and limited range of motion of his lumbar spine on flexion, extension and lateral flexion. Plaintiff was again referred to physical therapy for back and abdominal strengthening exercises to help reduce low back pain (Id. and Tr. 300).

22. The treatment notes from Plaintiff's second round of physical therapy are not contained in the administrative record. However, on March 5, 1998, Plaintiff's physical therapist sent the following report to Dr. Benzel:

> Summary of Progress: Functional level ↑ walking tolerance 20-25'; Standing tolerance 20'; sitting tolerance 30'-45'; LB mobility unchanged; LE stretches ↑ in Hamstrings. Overall impression ↑ level of ADL, with continued rt. hip burning intermittent pain. Continuous numbness rt. leg (chronic). Pt was benefitting from PT. Would like Patient to return for 2 weeks for review & further development of home Ex program, then DC to Independent program.

(Tr. 302).

23. Plaintiff returned to the University of New Mexico on March 9, 1998, complaining of persistent low back pain and pain into his right leg, numbness and weakness of the right foot, and an inability to perform exercises because of pain. (Tr. 298). He also reported continuing to smoke ½ pack of cigarettes per day. On physical examination he had 5/5 motor strength in both legs with "give way on (R) LE," and decreased sensation to light touch of the right foot. Based on this evaluation, he was felt to have significant degenerative disease of the lumbar spine and "flat back

10

syndrome." One more attempt at exercises and medication was planned, with surgery to be considered at the next visit.

### III. The ALJ's Decision.

24. The ALJ found that Plaintiff had severe medically determinable impairments of a fracture at T-2 and thoracic deformity, dysthymia, and degenerative disc disease, which did not meet or equal a listed impairment. He found that Plaintiff testimony regarding pain and functional limitation was not credible, that he had the residual functional capacity for a wide range of sedentary and light work, but that he could not return to his past relevant work. The ALJ relied on both the Medical-Vocational Guidelines, Rules 201.25[6] and 202.18[7], and the testimony of a vocational expert in determining that Plaintiff was not disabled.

### IV. Issues Raised.

25. Plaintiff contends that the ALJ erred for a variety of reasons, including

   A. Failing to consider his mental and intellectual limitations and his seizure disorder, and

   B. Improperly rejecting Plaintiff's credibility.

### V. Analysis

   **A. The ALJ did not err in evaluation of Plaintiff's impairments of borderline intellectual functioning, illiteracy and seizure disorder.**

26. The ALJ relied upon the evaluation of Dr. Parsons in discounting Plaintiff's claims of a

---

[6] RFC for sedentary work; individual aged 18-44; limited or less education; prior work experience skilled or semi-skilled - skills not transferable.

[7] RFC for light work; individual aged 18-44; limited or less education; prior work experience skilled or semi-skilled - skills not transferable.

11

learning disability or similar intellectual impairment. (Tr. 20). Dr. Parsons was aware of Plaintiff's claim of learning problems and dyslexia. (Tr. 227). There is no evidence that Plaintiff's level of literacy impeded his ability to complete the WAIS-R. Rather, Dr. Parsons specifically noted pain as the only factor which prevented Plaintiff from completing all of the subtests administered, and possibly depressing his test scores. (Tr. 229-230). I also note that when evaluated by Dr. Jakins, Plaintiff demonstrated no problems with dyslexia. (Tr. 233). The ALJ further found that Plaintiff could perform only simple unskilled work. (Tr. 21). His hypothetical question to the vocational expert assumed an ability to perform only simple repetitive work (Tr. 370, 372), thereby requiring the vocational expert to factor in a limited intellectual ability in combination with exertional limitations. **Hargis v. Sullivan**, 945 F.2d 1482, 1491 (10th Cir. 1991). (A claimant's mental impairment must also be evaluated in combination with the effects of other impairments). This description of Plaintiff's limited intellectual ability is consistent with the WAIS-R results.

27. The record contains substantial evidence that Plaintiff's seizure disorder did not affect his ability to work. His seizures disorder has been untreated since 1992. There is no medical evidence that he has suffered from seizures at any time relevant to his present claim for benefits. His own statement that seizures activity had recurred is not sufficient. **See Bernal v. Bowen**, 851 F.2d 297, 300 (10th Cir. 1988) (A claimant's statements regarding the severity of an impairment are not sufficient).

### B. The ALJ erred in evaluating Plaintiff's credibility.

28. The ALJ's findings as to a claimant's credibility are entitled to deference by the reviewing court provided those findings are "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." **Kepler v. Chater**, 68 F.3d 387, 391 (10th Cir.1995).

quoting **Huston v. Bowen**, 838 F.2d 1125, 1133 (10th Cir. 1988). "The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision." **S.S.R. 96-7p**, 61 F.R. 34483, 34485-34486. Here, the ALJ found Plaintiff's complaints not completely credible. I find that the ALJ's credibility assessment was seriously flawed. For example:

-- The ALJ discounted Plaintiff's credibility because he determined that the medical record contained no indication of difficulty walking or other significant problems, despite Plaintiff's statement to Dr. Jakins that he had been incapacitated for a couple of months after the accident and could not walk for seven months, and because he did not complain to treating physicians of an inability to sit for prolonged periods and the need to lay down during the day. The medical record does document objective evidence of difficulty walking. Plaintiff sustained fractures to his L2 vertebrae and pelvis on August 3, 1995. (Tr. 164, 190, 207-208). When discharged from the hospital on August 9, 1995, he was using a walker. (Tr. 173). On August 20, 1995, he was instructed to use a wheelchair. (Tr. 220). Medical personnel subsequently noted his use of a cane, and did not question the need therefore. (Tr. 207, 233). Dr. Karnaze documented a limp. (Tr. 195). Dr. Parsons noted pain when Plaintiff sat in one position for long periods. (Tr. 228). The last physical therapy note in the administrative record documented diminished tolerance for walking, standing and sitting. (Tr. 302).

-- The ALJ discounted Plaintiff's credibility because "it is apparent from the treatment records that (Plaintiff's) complaints of pain and resultant limitations are predicated on a desire to receive compensation from his 1995 motor vehicle accident and Social Security disability benefits." (Tr. 18). Although the ALJ may consider a claimant's motivation in

13

assessing credibility, **Hargis v. Sullivan**, 945 F.2d at 1489, I find no support for the ALJ's conclusion. None of Plaintiff's treating or examining physicians indicated any suspicion of malingering or exaggeration of symptoms. All examinations of Plaintiff documented objective evidence of pain and discrete functional limitations. Dr. Parsons felt that Plaintiff's IQ scores may have been depressed due to the impact of pain on his ability to pay attention and concentrate, an observation relied upon by the ALJ in assessing Plaintiff's mental functioning. When last seen at the University of New Mexico Hospital, Plaintiff's treating physicians were considering surgical options. Lastly, there is nothing untoward in any individual seeking redress in the courts when injured by a driver who has run a stop sign.

-- The ALJ discounted Plaintiff's credibility because the orthopedic surgeon consulting on his care during his week long hospitalization after his accident "discounted the presence of radiculopathy and indicated that the claimant could be released from the hospital." (Tr. 17, citing to Tr. 169). The medical report referred to does not state that there was no radiculopathy, only that the reviewing radiologists doubted that the radiculopathy present was related to a spinal etiology. (Tr. 169).

-- The ALJ discounted Plaintiff's credibility because "exclamation points on the October 29, 1997 notation following the claimant's statements that his back pain was worse with lying down and walking and that he had back 'swelling' with walking appear to indicate incredulity." (Tr. 19, referring to Tr. 315). The punctuation marks referred to are clearly quotation marks, not exclamation points. The note itself indicates no disbelief in Plaintiff's statement. The physical examination recorded the presence of thoracic deformity with severe spasm and guarding, decreased sensation to light touch and pin-prick of the entire right foot

14

and 4-/5 toe extension on the right.

29.     When the ALJ gives reasons for rejecting a claimant's credibility which are baseless or a misrepresentation of the record his conclusions are not supported by substantial evidence.

30.     Relevant regulations require that pain be considered in evaluating residual functional capacity. **20 C.F.R. §§404.1545 & 416.945**. **S.S.R. 96-8p** provides that the RFC assessment must be based on all of the relevant evidence in the case record. Pain symptoms are specifically included in the factors to be considered. "Careful consideration must be given to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions than can be shown by objective medical evidence alone." Id. at 61 F.R. 34474, 34477. I find that where, as here, the ALJ's credibility assessment is seriously flawed, the resultant residual functional capacity assessment cannot stand.

**VI.     Recommendation**

31.     For these reasons, I recommend that the Plaintiff's Motion to Reverse be granted, and that is matter be remanded to the Commissioner for additional proceedings to include reevaluation of Plaintiff's credibility and residual functional capacity.

**RICHARD L. PUGLISI**
**UNITED STATES MAGISTRATE JUDGE**